#28448-a-SLZ
**2018 S.D. 70**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

NATHAN D. CHASE,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MATTHEW M. BROWN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

MATTHEW W. TEMPLAR
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
    and appellee.


ELLERY GREY
Grey & Eisenbraun Law                     Attorneys for defendant
Rapid City, South Dakota                  and appellant.

* * * *

CONSIDERED ON BRIEFS ON
AUGUST 27, 2018
OPINION FILED **10/03/18**

#28448

ZINTER, Justice

[¶1.] Nathan Chase was convicted of second-degree murder. He appeals the circuit court's denial of his motion to suppress evidence obtained as a result of an investigatory stop. We affirm.

*Facts and Procedural History*

[¶2.] On January 23, 2017, at about 7:50 p.m., law enforcement responded to a call from a Rapid City motel regarding an assault. Officers discovered the body of Jeremy Little in the entrance to one of the motel rooms. He had been fatally stabbed in the face and neck, and there was substantial blood at the scene. Captain Tony Harrison of the Pennington County Sheriff's Office reviewed security footage of the hallway outside the room in which Little was found. He observed six people entering and leaving the room that night. Five of the individuals were identified and excluded as suspects. The sixth, an unidentified man, became the murder suspect. From the footage, Harrison observed that the suspect was a male of average weight and height wearing a black stocking cap, dark pants, dark shoes, and a tan Carhartt jacket over a black hooded sweatshirt.

[¶3.] After completing the initial investigation around 2:00 a.m., Harrison returned to the motel to search nearby dumpsters for the murder weapon. At about 3:15 a.m., he observed a man walking on the sidewalk about two blocks from the motel. Harrison believed the man resembled the suspect from the security footage based on height and weight. Harrison also noticed he was wearing a tan Carhartt jacket similar to the coat worn by the suspect. Yet, in contrast, the pedestrian wore his jacket over a white hooded sweatshirt rather than a black one. Additionally, his

-1-

shoes were white rather than dark, and he had on different colored pants than those worn by the suspect in the security footage. It was a cold evening and no one else was moving on the streets.

[¶4.] Based on the man's similar appearance—primarily his build and the Carhartt jacket—and his proximity to the crime scene, Harrison decided to investigate. He activated his emergency lights and stopped his unmarked vehicle next to the man, later identified as Nathan Chase. Harrison exited the car, introduced himself as a law enforcement officer, and informed Chase that he wanted to ask about an "event" at the motel. Chase agreed to a search of his person, and Harrison found a bloody knife in Chase's pocket. Chase was taken into custody and questioned. The blood on the knife was later matched to Little's DNA.

[¶5.] Chase was indicted for second-degree murder. Prior to trial, he moved to suppress the evidence obtained as a result of the stop. The circuit court denied the motion, ruling that Harrison had reasonable suspicion to initiate the investigatory stop. A jury found Chase guilty. He appeals the circuit court's decision. He does not challenge the circuit court's findings of fact. He only challenges the court's legal conclusion that Harrison had reasonable suspicion for the stop.

*Decision*

[¶6.] "The Fourth Amendment of the United States Constitution and Article VI, § 11 of the South Dakota Constitution protect individuals from unreasonable

searches and seizures."[1] *State v. Walter*, 2015 S.D. 37, ¶ 7, 864 N.W.2d 779, 782. Although it is preferable for law enforcement to obtain a warrant before conducting a search or seizure, a warrant is not necessary for less invasive intrusions, such as an investigatory stop. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968)). "[W]hen a person is subject to an 'investigative detention' rather than a full-blown custodial arrest, the officer need only have reasonable suspicion for the detention rather than the probable cause typically required." *Id.* (quoting *State v. De La Rosa*, 2003 S.D. 18, ¶ 7, 657 N.W.2d 683, 686). That is because "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *State v. Stanley*, 2017 S.D. 32, ¶ 13, 896 N.W.2d 669, 675 (quoting *Adams v. Williams*, 407 U.S. 143, 146, 92 S. Ct. 1921, 1923, 32 L. Ed. 2d 612 (1972)). Thus, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229, 105 S. Ct. 675, 680, 83 L. Ed. 2d 604 (1985). The question whether an officer has reasonable suspicion is viewed under the totality of the circumstances. *Stanley*, 2017 S.D. 32, ¶ 13, 896 N.W.2d at 675.

[¶7.] Chase argues Harrison only had a "sixth sense" about Chase being the perpetrator. He contends Harrison's testimony at the suppression hearing confirms

---

1. The State does not dispute that the stop was a "seizure" within the meaning of the Fourth Amendment. *See* U.S. Const. amend IV.

the stop was based on a mere "hunch." However, Harrison's testimony shows he relied on his twenty years of experience as a law enforcement officer in determining whether to stop an individual based upon all the information known to him at the time. It is well settled that law enforcement "officers [may] draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *State v. Mohr*, 2013 S.D. 94, ¶ 16, 841 N.W.2d 440, 445 (quoting *State v. Haar*, 2009 S.D. 79, ¶ 23, 772 N.W.2d 157, 167).

[¶8.] Moreover, "[a]lthough a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is 'considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 1687, 188 L. Ed. 2d 680 (2014) (first quoting *Terry*, 392 U.S. at 27, 88 S. Ct. at 1883; then quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1 (1989)). Here, Harrison's suspicion was not grounded on a mere hunch. He identified specific and articulable facts supporting his decision to stop Harrison.

[¶9.] Chase next argues that even if the stop was not based on a mere hunch, Harrison's articulated facts did not support the quantum of suspicion necessary to initiate an investigatory stop. He contends Harrison's information was stale because over seven hours had elapsed between the crime and the stop. He also contends the description of the suspected perpetrator was too general because the security footage only disclosed an individual of average height wearing a

Carhartt-style jacket. Further, he claims that even if it was a good description, Chase and his clothing did not match the suspect exactly. Chase also identifies non-incriminating inferences or explanations for the incriminating facts and circumstances Harrison relied upon for the investigative stop.

[¶10.]    We acknowledge Chase's point that seven and a half hours had elapsed between the crime and the stop. We also recognize that Chase's clothes were not identical to those worn by the unidentified male in the security footage and Harrison could not observe more specific physical attributes from the security footage.[2] But these facts alone do not foreclose reasonable suspicion. Rather, the determination whether reasonable suspicion existed must consider all facts available to Harrison at the time of the stop, viewed under the totality of the circumstances. *See Stanley*, 2017 S.D. 32, ¶ 13, 896 N.W.2d at 675.

[¶11.]    "Because the reasonable suspicion determination requires this Court to 'look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing,' a review of the salient facts known to [the officer] is necessary." *State v. Johnson*, 2011 S.D. 10, ¶ 8, 795 N.W.2d 924, 926 (quoting *State v. Herren*, 2010 S.D. 101, ¶ 7, 792 N.W.2d 551, 554). The record reveals that Harrison observed firsthand the suspect depicted in the motel's security footage. He testified that the Carhartt

---

2.    Chase claims that Captain Harrison's observation of a suspect's physical attributes via a security footage should be scrutinized in the same way as a physical description provided by an informant. *See, e.g.*, *United States v. Brown*, 448 F.3d 239, 250–51 (3d Cir. 2006). We disagree. A physical description relayed by a third party is wholly different than observations made firsthand by an officer. Harrison was relying entirely on his own observations when he stopped Chase, not a tip with questionable reliability.

jacket particularly stood out to him in the footage. He further explained that he observed an individual with the same build and jacket as the suspect walking alone at three in the morning only two blocks from the crime scene during a "frigidly cold" night. While he acknowledged Chase wore different colored clothing than shown in the footage, Harrison explained that quickly verifying the man was "not our guy" would have taken ten seconds and the man could be on his way. This was reasonable because "[i]t is quite possible that mutable characteristics of a suspect, such as attire . . . may vary significantly during a flight from apprehension." *State v. Faulks*, 2001 S.D. 115, ¶ 11, 633 N.W.2d 613, 617.

[¶12.] Ultimately, Chase's arguments require isolating the facts from the totality of the circumstances. However, Chase's type of "divide-and-conquer" analysis is not utilized in assessing reasonable suspicion. *Haar*, 2009 S.D. 79, ¶ 23, 772 N.W.2d at 167; *accord District of Columbia v. Wesby*, ___ U.S. ___, ___, 138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018) ("The totality-of-the-circumstances test 'precludes [a] divide-and-conquer analysis.'"). Moreover, "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow . . . a criminal to escape." *Adams*, 407 U.S. at 145, 92 S. Ct. at 1923.

[¶13.] Indeed, an unapprehended murder suspect poses a serious threat to public safety, and here, the circuit court found that law enforcement had no leads at the time of the stop. When a crime involves a threat to public safety, law enforcement's interest in detaining the suspect as quickly as possible may "outweigh the individual's interest to be free of a stop and detention that is no more

extensive than permissible in the investigation" of the crime. *Hensley*, 469 U.S. at 229, 105 S. Ct. at 680. Considering the totality of the circumstances, the substantial public safety interest in apprehending the homicide suspect that remained at large, and the minimal intrusion created by Harrison's stop, we conclude that the investigatory stop was based on reasonable suspicion within the meaning of the Fourth Amendment.

[¶14.]     Affirmed.

[¶15.]     GILBERTSON, Chief Justice, KERN, JENSEN, and SALTER, Justices, concur.